In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-01-279 CV


____________________



JUDY POWELL, JOHN L. LUTHER, BOBBE ALEXANDER, 


JUDY BROUSSARD, GENE RYDER AND ANA BERGH, Appellants



V.



ROGER E. FOXALL, Appellee






On Appeal from the 410th District Court


Montgomery County, Texas


Trial Cause No. 00-05-03327-CV






O P I N I O N


 Appellee Roger E. Foxall filed suit against appellants Judy Powell, John L. Luther,
Bobbe Alexander, Judy Broussard, Gene Ryder, and Ana Bergh, (1) individually and in their
official capacities, for defamation and intentional infliction of emotional distress. 
Appellants filed a motion for summary judgment on the grounds of qualified privilege,
official immunity in their individual capacity, sovereign immunity in their official capacity,
and insufficient evidence of intentional infliction of emotional distress. The trial court
granted summary judgment in favor of appellants on the claim for intentional infliction of
emotional distress but otherwise denied relief. In an interlocutory appeal, appellants assert
the trial court erred in denying their claims of immunity. See Tex. Civ. Prac. & Rem.
Code Ann. § 51.014 (a)(5) (Vernon Supp. 2001). In their first issue, appellants query,
"does official immunity shield them from individual liability for an error in the
newsletter?" Issue two asks, "does sovereign immunity preclude liability against the
Defendants in their official capacity?"

 The standard of review for denial of a summary judgment is the same as for the
granting of a summary judgment. The movant for summary judgment has the burden of
showing there is no genuine issue of material fact and it is entitled to judgment as a matter
of law. See Nixon v. Mr. Property Management Co., 690 S.W.2d 546, 548 (Tex. 1985). 
In deciding whether a disputed material fact issue precludes summary judgment, evidence
favorable to the non-movant is taken as true. Id. at 548-49. Every reasonable inference
in favor of the non-movant is indulged and any doubts are resolved in its favor. Id. The
movant must either disprove at least one element of each of plaintiff's theories of recovery
or conclusively establish each essential element of an affirmative defense. See City of
Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979). If the movant
conclusively proves all essential elements of his defense, the burden shifts to the non-movant. See Casso v. Brand, 776 S.W.2d 551, 556 (Tex. 1989). The non-movant must
answer that affirmative defense for summary judgment purposes. See Broussard v. Tyler
County Hosp., 831 S.W.2d 584, 586 (Tex. App.--Beaumont 1992, no writ).

 Appellants' summary judgment evidence includes an affidavit from each appellant,
as well as an affidavit from James Zukowksi and Gay T. McAlister. We first summarize
this evidence.

 James Zukowski, Director of Professional Licensing for the Texas Department of
Health (TDH), states there are eleven independent boards administratively attached to the
TDH that license health care professionals. All post information of interest to their
licensees, including recent disciplinary actions by their board, on the internet. Eight,
including the Texas State Board of Examiners of Professional Counselor's (the Board),
mail a newsletter to its licensees containing recent disciplinary actions taken by their
respective boards. Each of the eight boards has a staff provided by TDH and each staff
uses the same computerized complaint tracking system as the source of data. Zukowski
asserts it is reasonable and prudent for board staff to rely on the accuracy of information
input into the system. 

 The boards rely on their staffs to compile relevant data and organize and
disseminate the newsletter. Zukowski knows of no board where the members personally
edit the newsletter prior to publication. In the seven years Zukowski has held his current
position with the TDH, he is aware of no other instance of an inaccuracy in the publication
of board disciplinary action against a licensee.

 Judy Powell, Judy Broussard, Gene Ryder, Ana Bergh, and Gay T. McAlister are
members of the Board. As such they are generally responsible for regulating the practice
of professional counselors, licensing practitioners, disciplining practitioners who violate
Board rules, and protecting the public by requiring professional adherence to these rules. 
The Board sends a biannual publication, "The Examiner," to its licensees, containing
general Board information regarding its regulatory function, articles of interest to
licensees, and the process and results of disciplinary actions taken by the Board. At least
since 1995, "The Examiner" has contained a listing of recent disciplinary actions taken by
the Board. Ryder and McAlister were not on the Public and Professional Relations
Committee of the Board when the edition in question was published. 

 The Board meets four times a year. Typically, Board members, led by Broussard,
(Chairperson of the Public and Professional Relations Committee), discuss topics and agree
on individual responsibility for drafting articles to be included in the upcoming edition of
"The Examiner." Matters of additional content, as well as layout, the compilation of
recent disciplinary actions by the Board, and the actual publication of the newsletter, are
routinely given to the Executive Secretary or his designee. Broussard, Powell, Ryder,
Bergh and McAlister all attest these functions had been adequately performed by the
Executive Secretary or his designee in the past and they had no reservation in allowing
these duties to remain in the Executive Secretary's discretion.

 Broussard, Powell, Ryder, Bergh and McAlister all state they do not recall seeing
any drafts of the newsletter prior to its dissemination, nor do they recall any reason to
believe or suspect that any of the information it contained was incorrect. To the extent of
their involvement in the creation of the edition in question, they acted as Board members
with every intention being the fulfillment of their duties.

 Broussard, Powell, Ryder, and Bergh all aver they do not recall ever meeting
Foxall and bear him no ill will. They never had any intention to injure him; they had no
knowledge of the falsity of the statement printed in "The Examiner" prior to its
publication; they had no knowledge or reason to believe that the method of compiling the
names and particulars of recent disciplinary actions would result in the error that occurred. 
To their knowledge, the method of compilation had never before resulted in an erroneous
publication of an offense. McAlister concludes that it is her belief, from personal
knowledge of the actions of Board members and the process of the publication of "The
Examiner," that the actions of the Board, particularly members Powell, Broussard, Ryder
and Bergh, were reasonable and prudent under the circumstances. 

 John L. Luther was the Executive Secretary to the Board when the newsletter in
question was published. He states the duties he assigned or delegated to Bobbe Alexander
allowed for personal discretion. Alexander is the Program Supervisor of the Board and
acts as Administrative Assistant to the Executive Secretary. Luther has discretion over
intake and investigation of complaints. He shared discretion over this initial intake of
complaints, referral to investigation, and determination of whether to recommend pursuit
of an adverse licensing action with Alexander.

 Complaints against licensees were addressed to the Board, and upon receipt,
Alexander and Luther would make a threshold determination as to whether the complaint
articulated a rules violation. Alexander and Luther had the discretion to order
investigation of a complaint, determine jurisdiction of a complaint, or recommend closure
of the matter. Following completion of an investigation, they maintained the discretion to
make a recommendation to the Board regarding action on the complaint.

 To assist the Board and staff, a computer-based system was used, called the
Complaint Tracking System (CTS). CTS allowed for cataloging incoming complaints and
updating their status as they progressed through the administrative system. When a
complaint arrived, it was given to the Administrative Technician responsible for
maintaining the CTS. A new file was opened in the CTS, showing the name of the
complainant, the licensee who was the subject of the complaint, a category number that
designated the type of offense/Board rule alleged to have been violated, and the status of
the complaint. The status of the file would be "open" at the start of this process. From
March of 1999 through early March 2000, Lindal Page was primarily responsible for
operating CTS.

 Typically, when a complaint satisfied either or both the judgment of Alexander or
Luther as demonstrating a violation of Board rules, an investigation was requested. 
Following the investigation, Luther and Alexander would review the results and determine
whether to recommend further action or closure of the complaint. If a recommendation
of discipline was made to the Complaints Committee, and approved by the Committee, the
CTS would be updated to reflect the recommended action. Thus, the CTS would then
show an "open" status case, with an action against a licensee, classified by the rule alleged
to have been violated.

 At some time after the Committee approval stage, a notification letter would be sent
by Luther informing the licensee of a pending action and his options in protesting it. If
closure of the file were recommended to the Committee, and accepted, the file would be
designated "closed" without notation of any action.

 If action against a licensee was approved by the Committee, the licensee would have
the opportunity to agree to the recommended discipline, or request an administrative
process that included an informal settlement conference and/or a hearing before the State
Office of Administrative Hearings (SOAH). The decision by the SOAH officer would then
be presented to the Board for approval. Following the full administrative process, or
agreement by the licensee to proposed action by the Board, an update of whatever action
was to be taken against the licensee would be input into the CTS, and the status of the case
would be changed to "closed."

 In April and May of 1999, the Board received two complaints alleging Foxall had
improperly engaged in a dual relationship with one of his clients by attempting to secure
book and movie rights to the client's private life while she was engaged in therapy with
him. One of the complaints was filed by Foxall's employer, the other by his client. 
Alexander and Luther determined a rules violation had been committed and referred the
matter for further investigation. The results of that investigation led to their presentation
of the case to the Complaints Committee for consideration of disciplinary action. The
Committee recommended a one-year probated license suspension. The Board adopted the
actions of the Committee, with no names of licensees mentioned to the Board, pursuant to
policy, and the following Monday, Alexander gave her notes of the Committee's actions
to Lindal Page for her to update the CTS. 

 After Lindal Page vacated her position in early March, 2000, Luther assigned
Alexander to draft information and compile the data necessary to publish the Spring
edition. Alexander prepared the disciplinary action section to be included in the March
2000 edition of "The Examiner." To gather the necessary data, Alexander requested a
report from CTS showing all "closed" cases describing actions against licensees between
the months of September 1999 and March 2000. The report generated by CTS included
four names, each of which had CTS files indicating final or "closed" sanctions or actions
received for violations of the Board regarding sexual misconduct and various levels of
punishment. Foxall was one of the names appearing in this report.

 According to Alexander, at least three mistakes must have been made. First, at
some point after the creation of one of Foxall's CTS complaint files, the rule violation was
entered as "sexual misconduct" rather than "dual relationship." Second, following input
of the recommended discipline, the status designation in the CTS was improperly changed
from "open" to "closed." Third, Lindal Page vacated her position in early March of 2000. 
Page had been responsible for inputting data into the CTS during the relevant time period
and had she been present when the report was generated, might have recognized the error. 
Alexander did not.

 Luther reviewed drafts before it was sent for printing and mailing, but did not
recognize the inclusion of Foxall's name in the disciplinary section as an error. Luther
recalls some technical problems with the physical assembly of the documents for printing
and mailing, and the newsletter was not sent out until the first week of May, 2000. 

 Between April of 1999 and March of 2000, Alexander and Luther reviewed well
over a hundred complaints, and presented complaints to the Board regarding dozens of
licensees. The most prevalent Board rule violation resulting in discipline is the rule
regarding sexual misconduct. At no time prior to the publication and dissemination of
"The Examiner" did Luther or Alexander realize the error. Neither Luther nor Alexander
recall having ever personally met Foxall, and bear him no ill will. They deny any
intention to injure him; they had no knowledge or reason to believe that the method of
compiling the names and particulars of recent disciplinary actions would result in the error
that occurred. To their knowledge, the method of compilation had never before resulted
in an erroneous publication of an offense.

 Following notification of the error by Foxall, Luther immediately worked to remedy
the error by drafting and sending a personal retraction of the notice to every recipient of
the March 2000 edition. Luther drafted and sent Foxall a personal apology, spoke on the
phone with his employer and explained the error and sent a letter of retraction to his
employer. Luther offered to Foxall to contact anyone he wished to explain the publication
error.

 In response to appellants' motion for summary judgment, Foxall submitted as
evidence Chapter 503 of the Texas Occupations Code; Chapter 681 of the Texas
Administrative Code; portions of the depositions of Luther, Alexander, Broussard, 
Powell, and Ryder; and Foxall's affidavit. Foxall's response asserts appellants are not
entitled to either official immunity or sovereign immunity because the acts of officials
which are not lawfully authorized are not acts of the State. He further claims appellants
are not entitled to official immunity because there is a fact issue as to good faith. 

SOVEREIGN IMMUNITY


 Absent legislative consent to sue or waiver of sovereign immunity, the State of
Texas, its agencies, and its officials are protected from suit. See City of Cockrell Hill v.
Johnson, 48 S.W.3d 887 (Tex. App.--Fort Worth 2001, pet. denied). Foxall filed suit
against appellants "in their official capacities" but did not plead waiver or raise it in his
response to appellants' motion for summary judgment. (2) Foxall's only argument against
the application of sovereign immunity is that it "[does] not cover unauthorized or illegal
acts." Foxall contends that because there is no express authorization for the Board to
publish in a newsletter the disciplinary actions taken, the Board improperly exceeded its
authority and is therefore not immune. Foxall relies upon Camacho v. Samaniego, 954
S.W.2d 811 (Tex. App.--El Paso 1997, writ denied). In Camacho, the court was
considering on remand the effect of the Texas Supreme Court's declaration that the fee
being collected by the county was illegal. See Camacho v. Samaniego, 831 S.W.2d 804,
805 (Tex. 1992). There has been no comparable declaration that newsletters of the type
involved here are unauthorized. The legislature has expressly authorized state agencies
to use appropriated money to publish newsletters. See Tex. Gov't Code Ann. § 2113.107
(b)(6) (Vernon 2000). The Board is directed to "prepare and disseminate consumer
information." See Tex. Rev. Civ. Stat. Ann. art. 4512g, § 6 (e)(9) (Vernon Supp.
1998). (3) Absent any authority to the contrary, we find it within the Board's discretion to
inform consumers of the disciplinary actions taken against its licensees. Accordingly, we
find the trial court erred in failing to grant summary judgment in favor of appellants in
their official capacity. Issue two is sustained.

OFFICIAL IMMUNITY


 Official immunity is an affirmative defense. See City of Lancaster v. Chambers,
883 S.W.2d 650, 653 (Tex. 1994). To be entitled to a summary judgment on that defense,
appellants had to establish all the essential elements as a matter of law. Id. "The elements
of the defense of official immunity are (1) the performance of a discretionary function (2)
in good faith (3) within the scope of the employee's authority." Kassen v. Hatley, 887
S.W.2d 4, 9 (Tex. 1994).

 Regarding the first element, an act is not discretionary, i.e., is ministerial, if it
requires obedience to orders or the performance of a duty to which the actor has no choice. 
See Chambers, 883 SW.2d at 654. An act is discretionary if it involves personal
deliberation, decision and judgment. See id. Investigating and acting on gathered facts
is a discretionary function. See Fowler v. Szostek, 905 S.W.2d 336, 342 (Tex. App.--Houston [1st Dist.] 1995, no writ).

 Good faith, the second element, requires this court to look to whether a reasonable
official could have believed his or her conduct was lawful in light of clearly established
law and the information the official possessed at the time. See Chambers, 883 S.W.2d at
656. Thus, qualified immunity will protect all but the plainly incompetent or those who
knowingly violate the law. Id. The test is one of objective legal reasonableness, without
regard to whether the government official acted with subjective good faith. Id. The
plaintiff must do more than show a reasonably prudent official could have acted otherwise;
rather the plaintiff must show no reasonable person in the official's position could have
believed the facts justified his actions. Id. at 657.

 The third element, scope of authority, is satisfied if the official is discharging the
duties generally assigned to him or her. See Chambers, 883 S.W.2d at 658. "The fact
that a specific act that forms the basis of the suit may have been wrongly or negligently
performed does not take it outside of the scope of authority." Koerselman v. Rhynard, 875
S.W.2d 347, 350 (Tex. App.--Corpus Christi 1994, no writ).

 The evidence clearly established appellants' were performing a discretionary
function within the scope of their authority. Foxall's only challenge is to the good faith
element to which he contends a fact issue has been raised. Appellants' evidence
established the error occurred because incorrect data was entered into the CTS. The
record contains no explanation for that lapse. Appellants' evidence further established the
reliance placed upon the accuracy of the report generated by CTS was reasonable. 
Foxall's evidence does not demonstrate no prudent person could have reasonably relied on
the accuracy of the report. Thus, he has failed to raise a fact issue precluding summary
judgment. Issue one is sustained.

 The judgment of the trial court is reversed and rendered in favor of appellants.

 REVERSED AND RENDERED.





 DON BURGESS

 Justice


Submitted on October 11, 2001

Opinion Delivered November 29, 2001

Publish


Before Walker, C.J., Burgess and Gaultney, JJ.
1. Foxall also filed suit against Lindal Page. Page was not a party to the motion for
summary judgment filed by defendants and is not included as a party to the notice of
appeal. The record before this court does not reflect Page is no longer a defendant. 
Accordingly, this opinion cannot operate to effect Page.
2. Appellants' brief asserts, and Foxall does not dispute, that his attempts to secure
legislative consent for the suit were unsuccessful. 
3. Act approved May 28, 1999, 76th Leg., R.S., ch. 388 § 1, 1999 Tex. Gen. Laws
1431, 1990 (current version at Tex. Occ. Code Ann. § 503.251(a) (Vernon Pamph.
2001).